IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| STORMI BRYANT )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>)<br>MICHAEL J. ASTRUE, )<br>)<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | Case No.  4:12-CV-177-SPM |

## **MEMORANDUM OPINION**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant Michael J. Astrue, the Commissioner of Social Security, denying the application of Plaintiff Stormi Bryant for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act").  Because I find the decision denying benefits was supported by substantial evidence, I will affirm the Commissioner's denial of Plaintiff's application.

## **FACTUAL BACKGROUND**

Plaintiff is a single mother of two children, ages, 18 and 14.  At the time of the hearing in this case she was 42 years old.  She completed the 12th grade, but was in special education classes throughout school.  Plaintiff injured her back in a car accident in 1999 and suffered an injury to her right elbow in April 2004, for which she filed a claim for worker's compensation.  However, she continued working after sustaining those injuries.

1

Plaintiff last worked in August 2006 as a customer service representative for Medical Transportation Management where she set up non-emergency medical transportation. According to Plaintiff, she was laid off because she took vacation when she did not have enough vacation days to do so. In her application for disability benefits, Plaintiff claimed she has been totally disabled since September 1, 2007, due to back pain and right arm limitations.

## PROCEDURAL HISTORY

On August 11, 2009, Plaintiff applied for DIB and SSI; that application was initially denied. On December 7, 2009, Plaintiff filed a timely Request for Hearing by Administrative Law Judge (ALJ). After a hearing on August 27, 2010, the ALJ issued an unfavorable decision. Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeal's Council on February 7, 2011, but the Council declined to review the case on December 12, 2011. Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## LEGAL STANDARD

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in

which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e). At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f),

416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.*  At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523.  At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ in this case found that Plaintiff had the severe impairment of residual effects of right ulnar nerve transposition surgery performed on March 5, 2004.  The ALJ's "severe impairment" finding did not include Plaintiff's back, neck and shoulder complaints.  The ALJ further found Plaintiff had the RFC to perform "light work" except that she is limited to using her hands for frequent (not constant) fine manipulation.  The ALJ assumed, without specifically finding, that Plaintiff could not return to her past relevant work.  Relying on the Medical-Vocational Guidelines (the "Grid"), the ALJ found that Plaintiff was not disabled because given Plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

Plaintiff argues the ALJ's decision is not supported by substantial evidence because (i) the ALJ failed to properly consider all of Plaintiff's impairments at Step Two; (ii) the ALJ failed

to properly consider medical opinion evidence when determining Plaintiff's RFC; and (iii) in determining Plaintiff was not disabled at Step Five, the ALJ improperly relied on the Grid rather than obtaining testimony from a vocational expert.

## **DISCUSSION**

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).  "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)).  In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.*  However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).  "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).  The court should disturb the administrative decision only if it falls outside the available "zone of choice" of conclusions that a reasonable fact finder could have reached. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006).

**A.  THE ALJ'S FAILURE TO INCLUDE BACK PAIN AS A SEVERE IMPAIRMENT**

At Step Two of the disability analysis, the ALJ concluded that Plaintiff had the severe impairment of "residual effects of right ulnar nerve transposition surgery performed on March 4, 2005."  Plaintiff argues that the ALJ erred in failing to properly consider chronic back pain, caused by medically diagnosed spinal subluxations, muscle spasm, and leg-length discrepancy, as a severe medically determinable impairment.  *See* Pl.'s Br. 11-15.

To show that an impairment is severe, a claimant must show that she has (1) a medically determinable impairment or combination of impairments, which (2) significantly limits her physical or mental ability to perform basic work activities, without regard to age, education, or work experience.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c); 404.1521(a), 416.920(a)(4)(ii), (c); 416.921(a).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  The requirement of severity is not an "onerous requirement," but it is also "not a toothless standard."  *Id*.

As Plaintiff's brief correctly notes, the record facts in this case support a finding that Plaintiff had medically determinable conditions causing back pain; however, I find the ALJ's conclusion that that Plaintiff's back pain did not "significantly limit her physical or mental ability to perform basic work activities" is supported by substantial evidence.  A review of the administrative record reveals that Plaintiff's back problems originated with a car accident in 1999.  She continued working for several years after the accident; and, although she initially sought treatment for back pain at somewhat regular intervals between 1999 and 2004, the record reflects that, after 2004, Plaintiff did not seek treatment for back pain until five years later in September 2009, when she sought treatment for back pain and back spasms from the emergency

department at St. Joseph's Health Center in Wentzville. She next sought treatment for back pain in July 2010 from Dr. Blake Anderson at Crider Health Center.[1] Physical examination by Dr. Blake in July 2010 revealed no abnormality of Plaintiff's back and spine, although her spine was positive for posterior tenderness, diffuse TTP of the lumbar through thoracic spine, and stiffness with flexion and extension. Musculoskeletal examination revealed no cervical spine tenderness and normal mobility and curvature. The diagnosis was chronic low back pain. Plaintiff was prescribed 800 mgs of ibuprofen and Vicodin as needed for pain. An X-ray of her lumbar spine taken on August 16, 2010 was "unremarkable," and an MRI of her lumbar spine taken on September 2, 2010, revealed "no significant abnormality." Reviewing the record as a whole, the ALJ's decision to exclude Plaintiff's back pain as a severe impairment fell within the zone of choices available to the ALJ.

Even if, as Plaintiff contends, it was error for the ALJ to exclude Plaintiff's chronic back pain as a severe impairment, the error is harmless. Courts frequently find that, even if erroneous, an ALJ's failure to find a particular impairment severe does not require reversal where the ALJ considers all of a claimant's impairments, severe and non-severe, in his or her subsequent analysis. *See Spainhour v. Astrue*, No. 11-1056-SSA-CV-W-MJW, 2012 WL 5362232, at *3 (W.D. Mo. Oct. 30, 2012) ("[E]ven if the ALJ erred in not finding plaintiff's shoulder injury and depression to be severe impairments at step 2, such error was harmless because the ALJ clearly considered all of plaintiff's limitations severe and nonsevere in determining plaintiff's RFC."); *Givans v. Astrue*, No. 4:10-CV-417-CDP, 2012 WL 1060123, at *17 (E.D. Mo. March 29, 2012) (holding that even if the ALJ erred in failing to find one of the plaintiff's mental impairments to

---

[1] As discussed below, the administrative record reflects that, in addition to back pain, Plaintiff sought treatment for other types of pain such as neck, shoulder and dental pain, and those issues were considered by the ALJ in other parts of his decision.

7

be severe, the error was harmless because the ALJ found other severe impairments and considered both those impairments and the plaintiff's non-severe impairments when determining Plaintiff's RFC). *See also* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) ("If you have more than one impairment. We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity.").

Here, the ALJ clearly considered all of Plaintiff's limitations, including her back, neck and shoulder pain, in his analysis after Step Two. As discussed in detail below, the ALJ considered Plaintiff's other conditions in determining the Plaintiff's RFC and in his discussion regarding his credibility determinations. Because the ALJ proceeded beyond Step Two of the disability analysis and considered all of Plaintiff's impairments, including her back, neck, and shoulder pain, to the extent that the ALJ erred in failing to find Plaintiff's back pain a severe impairment, the error was harmless.

## B.  THE ALJ'S EVALUATION OF MEDICAL OPINION EVIDENCE

Plaintiff argues that Defendant's decision is not supported by substantial evidence because the ALJ failed to properly evaluate opinion evidence in making his RFC determination. *See* Pl.'s Br. at 7-9. The evidence before the ALJ included opinions from two non-treating physicians, Dr. Shawn Berkin and Dr. Alan Morris.

### 1.  *Dr. Shawn Berkin (2006 Medical Examination)*

On March 22, 2006, Dr. Shawn Berkin performed an independent medical examination of Plaintiff in connection with an on-the-job injury Plaintiff sustained to her right elbow in April 2004. In a report dated July 31, 2006, Dr. Berkin indicated that he reviewed Plaintiff's medical history, including records from Unity Corporate Health Services, Anthony Sudekum, MD,

Daniel Phillips, MD, Devyani Hunt, MD, Richard Gelberman, MD, and David Peeples, MD. Dr. Berkin also reported reviewing radiology reports from Open MRI of St. Louis, St. John's Mercy Medical Center and St. Charles Orthopedic Surgery MRI, a surgery report from Barnes-Jewish Hospital, dated March 4, 2005 and Physical Therapy Records from Pro Rehab. None of the aforementioned records were included in the record of the administrative proceedings this case.

According to Dr. Berkin's report, those records reflected that Plaintiff was injured at work in April 2004 when a trash container struck her right elbow. She was subsequently treated for a contusion of the right elbow. After undergoing EMG and nerve conduction studies on February 9, 2005, Plaintiff was diagnosed with cubital tunnel syndrome.[2] On March 14, 2005, Plaintiff was treated surgically with an anterior transposition of the ulnar nerve at the right elbow and cubital tunnel release. After her surgery, Plaintiff was referred for physical therapy which she attended at Pro Rehab. Plaintiff was later evaluated and her electrical studies repeated. In a report dated August 2, 2005, EMG and nerve conduction studies were reported to be normal.

At the time of Dr. Berkin's examination, Plaintiff was complaining of pain and tenderness to her right arm and elbow and numbness to the fourth and fifth fingers of her right hand. Dr. Berkin's examination of Plaintiff, which included a test of grip strength and pinch strength using the Jamar dynamometer and Jamar pinch gauge, revealed that Plaintiff had normal grip strength in both hands.

Dr. Berkin concluded that, based on his examination of Plaintiff and review of her medical records, Plaintiff suffered a 35% permanent partial disability of the right upper extremity

---

[2] Cubital tunnel syndrome is "a group of symptoms that develop from compression of the ulnar nerve within the cubital tunnel at the elbow" and "can include paresthesia into the fourth and fifth digits and weakness of some of the intrinsic muscles of the hand." *MediLexicon International*, http://www.medilexicon.com/medicaldictionary.php (citing *Stedman's Medical Dictionary*).

at the level of the elbow.  Dr. Berkin went on to recommend that Plaintiff take certain measures in order to "lessen her symptoms, preserve and maintain her overall level of function, and prevent or delay any progression of her condition," including using anti-inflammatory medication to control right arm and elbow pain; participating in a home exercise program to strengthen and improve the mobility and flexibility of her right arm and elbow; and avoiding working with her elbow flexed for extended periods of time.  He also recommended a 25-pound lifting restriction from the floor to the waist and a 15 pound lifting restriction from the waist to the level of the shoulder.  In addition, he recommended that if Plaintiff were required to perform hand-intensive activities for an extended period of time, she should have frequent breaks in order to recover, to avoid exacerbation of her symptoms or further injury to her right arm and elbow.

### 2.  *Dr. Alan Morris (2010 Consultative Examination)*

At the hearing before the ALJ, Plaintiff's counsel requested a consultative examination and explained that a consultative examination was desirable because "aside from the transposition in her hand, [Plaintiff's] issues are subjective complaints of pain that from the record that I have seen right now, I don't see an objective record to substantiate the issues . . . ." (Tr. 32).  The ALJ granted the request for a consultative examination and, on September 13, 2010, Plaintiff was examined by Alan Morris, MD.

Upon physical examination, Dr. Morris found Plaintiff could "walk 50 feet without a cane" but "tends to walk with a stiffness in her low back and a slight limp favoring the right leg." He also found Plaintiff could "stand erect" and is "able to toe walk, heel walk and do a tandem gait normally."  She can "squat to 120 degrees bilateral knee flexion.  She is able to dress, undress, get on and off the examination table, and arise from a chair independently."  He found a "full range of elbow motion" despite hyper sensitivity on the medial aspect of the right elbow.

10

Regarding her hands, Dr. Morris found Plaintiff could oppose the thumb to all fingers bilaterally but her grip was very weak on the right at 2/5, with 5/5 strength on the left. He also found decreased sensation to pinprick in the fifth finger but no atrophy. Her lower extremity deep tendon reflexes were 2/4, and she had a positive straight leg raise. He found no muscle spasm in either her lumbar or cervical spine. Based on his examination, Dr. Morris diagnosed ulnar nerve transposition right elbow; low back pain, currently being evaluated with MRI, results pending; and neck pain.

The same day, Dr. Morris completed a Medical Source Statement form ("MSS") and checked boxes indicating that Plaintiff could occasionally lift and carry up to 10 pounds with her left arm but could lift no weight at all with her right arm. He estimated Plaintiff could sit, stand, and walk for 15 minutes at a time, while over the course of an 8-hour workday she could sit for 4 hours, stand for 3 hours, and walk for 1 hour. Dr. Morris estimated that Plaintiff could occasionally reach overhead, handle, feel, and finger, but never perform other reaching or push/pull with her right arm. With her left arm, Plaintiff could frequently handle, finger, feel, and push/pull, occasionally reach overhead, but never perform any other reaching. Dr. Morris indicated that Plaintiff could frequently operate foot controls, and that she could occasionally climb stair and ramps, balance, stoop, kneel, crouch, and crawl, but never climb ladders or scaffolds. He also opined that Plaintiff could occasionally be exposed to unprotected heights, moving mechanical parts, and operate a motor vehicle. (Tr. 376-381).

> 3. *The ALJ's decision to give less weight to Dr. Morris' opinions in the MSS is supported by substantial evidence*.

In determining Plaintiff's RFC, the ALJ considered the opinions of both Dr. Berkin and Dr. Morris, but noted that Dr. Morris' assessment in the MSS "cannot be given significant weight," while Dr. Berkin's functional description of Plaintiff's right arm "deserves to be given

11

more weight." (Tr. 18). Plaintiff argues the case should be reversed and/or remanded because the ALJ failed to adequately support his decision to give less weight to Dr. Morris' opinion and, as a result of that failure, the ALJ's RFC determination is not supported by substantial evidence. I disagree.

The ALJ took issue with Dr. Morris' findings in the MSS on several fronts. First, the ALJ found that Dr. Morris' description of severe functional restrictions in the MSS was inconsistent with Dr. Morris' own findings on physical examination and inconsistent with the record as a whole. (Tr. 18). It is well-established that even the opinion of a *treating* doctor, which is generally entitled to controlling weight, can be given less weight if it is inconsistent with or contrary to the medical evidence as a whole. *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007); *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) ("A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions."). *See also Goetz v. Barnhart,* No. 05-2267, 182 F. App'x 625, 625-26, 2006 WL 1512176, at *2 (8th Cir. June 2, 2006) (unpub. per curiam) (declining to give controlling weight to the treating physician's opinion because the treating physician's notes were inconsistent with her residual functional capacity assessment).

There is ample evidence to support the ALJ's conclusion that Dr. Morris opinion in the MSS is inconsistent with his own findings on physical examination and the record as a whole. For example, Dr. Morris reported that his physical examination of Plaintiff revealed that she had full 5/5 strength in her left hand; a full range of motion in her elbow; a level pelvis; and no significant abnormalities in her spine; yet, in the MSS, Dr. Morris indicated that Plaintiff could not lift more than 10 pounds in her left hand and was limited in reaching and handling in her left hand. In addition, Plaintiff's chief complaints to Dr. Morris were numbness in her right hand

fingers and low back and neck pain. Yet the record shows Plaintiff sought very limited treatment for those complaints during the relevant period. For example, Plaintiff sought and received treatment for back pain from a chiropractor, Dr. Coogan, between October 1999 through April 2004. X-rays of her spine taken in 1999 revealed subluxation of C2 with "a no significant" shift in weight bearing and a "marked reduction of the overall sagittal range of motion;"[3] multiple subluxations of the thoracic spine; and subluxation of the sacrum and L3.

After 2004, Plaintiff did not seek medical treatment for back, neck, or shoulder pain until five years later in September 2009—two years after her alleged onset date—when she reported an onset of muscle spasm in her back. At that time, she denied joint pain, and examination revealed tenderness and muscle spasm in her left paralumbar area, but no other symptoms or problems. On November 16, 2009, she complained of a one-week history of right sided neck pain. She described the pain as "mild" and indicated that it did not limit her activities. Her gait and motor strength were normal. She complained of an onset of shoulder pain on December 13, 2009, but she had normal range of motion, strength, and reflexes.

She next sought emergency room treatment on January 6, 2010, for shoulder pain radiating through her neck and left hand. She told the examining physician, Dr. Glueck, that the pain began in mid-November 2009, and she described subjective tenderness to palpation over her left trapezius musculature, pain on range of motion of her shoulder, and decreased sensation in her index finger and thumb. Dr. Glueck offered a shoulder injection, which Plaintiff refused, and prescribed Motrin (ibuprofen) for pain. X-ray examination of her cervical spine and left shoulder were essentially normal with some "very mild" changes in the lower cervical spine with relatively normal alignment.

---

[3] Subluxation is defined in *Stedman's Medical Dictionary* (28th ed.) as "an incomplete luxation or dislocation; although a relationship is altered, contact between joint surfaces remains."

Plaintiff next sought treatment seven months later, on July 29, 2010, when she presented to Crider Health Center with complaints of back spasms. At the time, she was taking ibuprofen "every now and then" and Vicodin "rarely". On examination, she had subjective posterior tenderness over her spine with no spasm and negative straight leg raising. She had no cervical spine tenderness, no motor weakness, and intact deep tendon reflexes. She was again prescribed ibuprofen and instructed to use Vicodin as needed on a limited basis. An X-ray of her lumbar spine taken on August 16, 2010 was "unremarkable," and an MRI of the lumbar spine taken on September 2, 2010, revealed "no significant abnormality."

The minimal objective medical findings, Plaintiff's limited treatment, and the prescription of mild pain relievers such as ibuprofen, are at odds with Dr. Morris's description of Plaintiff as disabled by chronic back, neck, and elbow pain. The ALJ properly discounted Dr. Morris's opinion because it was inconsistent with his own findings and the record as a whole. See 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).

The ALJ also indicated that Dr. Morris appeared to have simply accepted as true Plaintiff's description of her limitations, and the record supports that conclusion. For example, during Dr. Morris' physical examination, Plaintiff walked with a limp, but she had full muscle strength in her legs and no muscle spasm or pathological reflexes suggesting a spinal impairment. Unbeknownst to Dr. Morris, X-ray and MRI examinations of Plaintiff's lumbar spine, which he did not have at the time of his examination, confirmed there was no spinal impairment; they too revealed "no significant abnormalities." (Tr. 388-390). Indeed, Dr. Morris wrote in his report that Plaintiff told him that she could only sit, stand or walk for 15 minutes at a time before she had to stop. (Tr. 375). Dr. Morris then simply wrote this down on his Medical Source Statement. As with a treating source, Dr. Morris' opinion may be given less weight to

the extent it is based on the claimant's subjective complaints rather than medical evidence. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to Dr. Harry's opinion, because it was based largely on Kirby's subjective complaints rather than on objective medical evidence.").

On the other hand, emphasizing the fact that Dr. Berkin performed objective testing, such as the Jamar grip and Jamar pinch testing, the ALJ found Dr. Berkin's report regarding the functional description of Plaintiff's right arm to be better supported by the medical evidence. (Tr. 18). This conclusion is not unreasonable in light of the record as a whole. It is important to note that although the ALJ did not afford controlling weight to Dr. Berkin's opinion, the ALJ's RFC determination is generally consistent with, and supported by, Dr. Berkin's opinion and the medical evidence as a whole. For example, Dr. Berkin indicated that Plaintiff could lift a maximum of 25 pounds with lifting of up to 15 pounds from waist to shoulder level. That is generally consistent with the ALJ's finding that Plaintiff could perform light exertional level work, which requires lifting a maximum of 20 pounds and more frequent lifting of up to 10 pounds. *See* 20 C.F.R §§ 404.1567(b), 416.967(b). Dr. Berkin also indicated that Plaintiff needed frequent rest breaks if she performed hand intensive activity for an extended period of time. The ALJ appears to have accounted for Dr. Berkin's suggestion of "frequent breaks" by limiting Plaintiff to, at most *frequent*, rather than *constant*, fine manipulation with her hands. Thus ALJ's decision to limit Plaintiff's use of her hands for fine manipulation to "frequent" hand activity, and to exclude the rest breaks called for by Dr. Berkin, was reasonable.

### C. THE ALJ'S RELIANCE ON THE MEDICAL-VOCATIONAL GUIDELINES

The ALJ found that Plaintiff is capable of engaging in "light work" per the Medical–Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Grid"), except that she

is limited to using her hands for frequent (not constant) fine manipulation. Relying on the Grid, at Step Five, the ALJ concluded Plaintiff was not disabled despite this limitation because Plaintiff "retains the ability to use both hands frequently"; as such, "the additional limitations have little or no effect on the occupational base of unskilled light work." (Tr. 20).

Citing *Lucy v. Chater,* 113 F.3d 905 (8th Cir. 1997), Plaintiff argues that the restriction on fine manipulation is a non-exertional limitation that required the ALJ to obtain vocational expert testimony rather than relying on the Grid to determine whether Plaintiff was disabled at step five. However, "'an ALJ may use the [Grid] even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the [Grid].'" *Lucy*, 113 F.3d at 908 (quoting *Thompson v. Bowen*, 850 F.2d 346, 349 (8th Cir. 1988)); *see also Evans v. Chater*, 84 F.3d 1054, 1056 (8th Cir. 1996) ("The [Grid] can be used to determine disability, provided that the nonexertional impairments do not significantly diminish the claimant's residual capacity to perform the activities listed in them."). *See also Thompson v. Astrue*, 226 F. App'x 617, 621 (8th Cir. 2007) (affirming the ALJ's use of the Grid even where the plaintiff had nonexertional impairments of pain and obesity; noting that the ALJ had properly found that the claimant's nonexertional impairments did not diminish his work capacity and that sedentary work accommodated the claimant's pain, obesity, and postural limitations).

In this case, a limitation to no more than frequent fine manipulation is consistent with light work as explained in SSR 83-10. That ruling provides that light exertional level jobs as used in the Grid "generally do not require use of the fingers for fine activities to the extent required in much sedentary work." Thus, while a limitation to no constant fine manipulation

16

would significantly erode the vocational base and prelude application of the Grid for *sedentary* work, *see* SSR 96-9p, it does not preclude application of the Grid for *light* work. Social Security Rulings are treated with deference by the court; where a reasonable interpretation of the statute is offered, it is lawful. *Barnhart v. Walton,* 535 U.S. 212, 224 (2002). These Social Security Rulings indicate that fine fingering is not a major component of light work, and thus does not significantly diminish the pool of jobs available to Plaintiff. Therefore, assuming the ALJ properly excluded any other non-exertional limitations, testimony from a vocational expert was not required.

Citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991), and *Evans v. Chater,* 84 F.3d 1054, 1056 (8th Cir. 1996), Plaintiff further argues that vocational testimony would have been warranted had the ALJ not erroneously evaluated opinion evidence in determining Plaintiff's RFC. The cases cited by Plaintiff prohibit reliance on the Grid if the record supports a finding that Plaintiff has credible nonexertional limitations caused by pain. On the other hand, "if a claimant's subjective allegations of pain are appropriately discredited for legally sufficient reasons, such as inconsistencies in the record evidence, the ALJ may employ the [Grid] to direct a determination of not-disabled." *Cline*, 939 F.2d at 565. Plaintiff's argument that vocational expert testimony was required implicitly challenges the ALJ's credibility determination.

Before determining an applicant's RFC, the ALJ must determine the applicant's credibility, as his or her subjective complaints play a role in assessing his RFC. *Pearsall v. Massanari,* 274 F.3d 1211, 1217-18 (8th Cir.2001). Applying the factors discussed in *Polaski v. Heckler,* 739 F.2d 1320, 1322, the ALJ in this case found that Plaintiff was not fully credible about the severity of her symptoms and limitations because (i) Plaintiff's allegations of disability were inconsistent with the objective medical evidence, which spanned many years; (ii) Plaintiff

17

continued working after the two incidents that she claims are the source of her severe limitations; (iii) the medical treatment records indicate that some of the conditions Plaintiff complains of (i.e., shoulder and neck pain) are transient in nature; and (iv) Plaintiff's inconstant work history suggests lack of motivation to work. (Tr. 17-19).

While the ALJ may not discount Plaintiff's complaints solely because they are not fully supported by objective medical evidence, Plaintiff's complaints may be discounted based on inconsistencies in the record as a whole. *Lowe v. Apfel,* 226 F.3d 969, 972 (8th Cir. 2000). In addition, "where adequately explained and supported, credibility findings are for the ALJ to make." *Id.* As detailed above, the evidence before the ALJ revealed that throughout the relevant period, Plaintiff used primarily ibuprofen for pain relief and sought infrequent treatment for pain. The objective medical evidence did not identify a basis for her complaints of disabling pain. While Plaintiff may have experienced some pain from time to time, her sporadic treatment strongly suggests that it was not so severe as to preclude her from performing light exertional activity on a long-term basis. "The ALJ may properly consider both the claimant's willingness to submit to treatment and the type of medication prescribed in order to determine the sincerity of the claimant's allegations of pain." *Gray v. Apfel*, 192 F.3d 799, 804 (8th Cir. 1999) (quoting *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991)).

The record further reveals that Plaintiff continued working after her 1999 car accident to which she attributes to chronic back pain, and that she continued working after the 2004 on-the-job injury to her right arm that is the basis of the ALJ's severe impairment finding. The evidence also establishes that Plaintiff did not stop working due to any of the conditions or limitations alleged. Rather, Plaintiff told Dr. Morris, and testified at the hearing, that she stopped working in August 2006, because she was "downsized" or laid off. The fact that a claimant left a job for

18

reasons other than his medical condition is a proper consideration in assessing credibility. *See Medhaug v. Astrue*, 578 F.3d 805, 816-17 (8th Cir. 2009) ("It was also relevant that Medhaug did not leave his position as a laborer for an electric company . . . because of any back injury. Medhaug was laid off from the position due to a decline in work, and Medhaug claimed the date he was laid off was the same date of the alleged onset of disability.") (citations omitted).

The evidence also establishes that when Plaintiff stopped working in August 2006, she filed for unemployment benefits.  A claimant who applies for unemployment compensation benefits holds herself out as available, willing, and able to work.  *See* Mo. Rev. Stat. § 288-040(1)-(2) (2012).  Because such an application necessarily indicates an ability to work, it is evidence that weighs against an applicant's claim that she was disabled.  *See Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991).

It was also proper for the ALJ to consider the apparently transient nature of some of Plaintiff's conditions and Plaintiff's work history in his credibility determination.  The Eighth Circuit has noted that "[a] lack of work history may indicate a lack of motivation to work rather than a lack of ability." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993) (claimant's credibility is lessened by a poor work history)).

In sum, the ALJ adequately explained the inconsistencies upon which he relied to discount Plaintiff's subjective complaints.  The ALJ determined the record only supported a limitation that Plaintiff could not perform constant fine manipulation with her hands, and that determination is supported by substantial evidence.  Because the ALJ found, and the record supports the finding, that Plaintiff's limitation to frequent fine manipulation with her hands did

not diminish her ability to perform light work, use of the Medical-Vocational Guidelines was sufficient and the testimony of a vocational expert was not required.

## CONCLUSION

For all of the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner of Social Security is **AFFIRMED.**

A separate judgment in accord with this Memorandum and Order is entered this date.


        /s/Shirley Padmore Mensah
        SHIRLEY PADMORE MENSAH
        UNITED STATES MAGISTRATE JUDGE


Dated this 13th day of February, 2013.